Date signed August 22, 2014



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at GREENBELT

| In Re: | |
|---|---|
| Prince Frederick Investment, LLC | Case No.   12-20900-TJC |
| Debtor | Chapter   11 |
| Atlantic Builders Group, Inc. | |
| Plaintiff vs. | Adversary No.   13-00461 |
| Old Line Bank, *et al.* | |
| Defendants | |

**MEMORANDUM OF DECISION**

Before the court is the motion filed by defendants Old Line Bank (the "Bank") and Prince Frederick Investment, LLC (the "Debtor") to dismiss the second amended complaint because, among other things, the complaint fails to state a claim for equitable subordination. Docket No. 36. Plaintiff Atlantic Builders Group, Inc. ("ABG") opposes the motion. Docket No. 37. For the reasons set forth herein, the court concludes that ABG's second amended complaint fails to state a plausible claim for equitable subordination, and will dismiss the complaint with prejudice.

1

**Procedural Background**

At a hearing held on March 13, 2014, the court granted the Bank's motion to dismiss the first amended complaint and gave ABG twenty-one days to file an amended complaint. ABG made new factual allegations in its opposition to the motion to dismiss and at the hearing, which were not included in its first two complaints. ABG contended that the new claims supported its claim of equitable subordination. The court gave ABG one last opportunity to amend its complaint to state a plausible claim for relief. ABG filed the second amended complaint (referred herein as the "Complaint") on April 03, 2014. Defendants renewed their motion to dismiss the Complaint, opposed by ABG, and the court held a further hearing on June 19, 2014.

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§1334 and 157(a) and Local Rule 402 of the United States District Court for the District of Maryland. This memorandum of decision resolves a core matter under 28 U.S.C. §157(b)(2)(B) and (O).

**Facts as Alleged in the Complaint**

The Debtor was formed for the purpose of constructing and operating the West Lake Medical Center (the "Center"). Complaint at ¶8. On August 8, 2008, ABG entered into a contract with the Debtor (the "Contract") to construct the Center for $2,082,000 subject to additions and deductions as provided by the Contract. *Id*. at ¶14. ABG began construction of the Center in September 2008. *Id*. at ¶18. On or about October 22, 2008, the Bank, through its predecessor in interest Maryland Bank and Trust Company, N.A., made an initial $2,976,000 construction loan to Westlake Investors, LLC for the construction of the Center, which was increased to $3,326,000 on January 14, 2010. *Id*. at ¶¶9, 11. The loan was secured by a first priority lien in the Center and was guaranteed by the Debtor. *Id.* at ¶10.

At the time construction began on the Center in the fall of 2008, the Bank and ABG entered into a Contractor's Agreement to Complete (the "Contractor Agreement"). It provided that ABG could not terminate the Contract until the Bank had an opportunity to remedy the default, provided that the Bank advanced funds for ABG's completion of the work. *Id*. at ¶¶15-16. It provided, among other things,

> 3. <u>Change Orders; Alterations in the Plans and Specifications</u>. [ABG] covenants and agrees that, without the prior written approval of the Bank, [ABG] shall not: (a) enter into, or permit to become effective, any change order which shall increase the amount of the Contract in excess of $5,000 or any change order that, when aggregated with all prior change orders, results in an aggregate cost increase in excess of $25,000, or (b) agree to the alteration of the Plans and Specifications if such alteration would (i) result in a structural change that has not been approved by the Architect, or (ii) change the "footprint" of the Project.

Docket No. 36-4 at 2.[1] It also provided:

> 7. <u>Notice of Default</u>. [ABG] will give the Bank written notice of any default by the [Debtor] under the Contract within seven (7) days of such default. In the event of any default by the [Debtor] under the Contract, [ABG] will not terminate its obligations under the Contract until [ABG] shall have given the Bank written notice of such default, and the Bank shall have been given a period of thirty (30) days after the receipt of any such notice within which to (i) remedy any such default or (ii) request [ABG] to continue to furnish its services under and pursuant to the Contract, provided that the Bank thereafter advances or causes to be disbursed or advanced, funds as provided for in the Contract from and after the date of [ABG's] notice to the Bank. [ABG] reserves all claims it may have against the [Debtor].

*Id.*

ABG submitted monthly payment applications to the Debtor as construction progressed. *Id*. at ¶19. The monthly payment applications included all change orders that had not been resolved or approved by the Debtor as the date of the application. *Id*. at ¶20. These payment applications were reviewed by agents for both the Debtor and the Bank. *Id*. at ¶¶21-22. The Bank's agent prepared a monthly report which contained approval of ABG's funding requests

---

[1] The Complaint refers to the Contractor Agreement and the defendants submitted it as an exhibit to the motion to dismiss.

including increase in costs associated with change orders necessitated by various permit and design issues. *Id*. at ¶¶23-25, 27, 33. The Debtor, with the Bank's approval, increased the total amount due to ABG to $2,382,614 of which ABG was paid $2,172,950. *Id*. at ¶37.

The project had numerous problems that delayed completion and added to the cost of construction. *Id*. at ¶¶27-38. The problems included: (1) the inability to obtain an electrical permit because of deficiencies in the architect's documents and design; and (2) serious design errors in the Center's three roofs. *Id*. These problems delayed construction by more than six months and resulted in delay claims of $318,656. *Id.* at ¶38.

The Bank and ABG routinely communicated about timing of approval of payments and distribution of payments. *Id.* at ¶¶54-55. The Bank approved ABG's change orders and authorized disbursement of funds to pay ABG and other expenses in connection with the Center's construction, but ABG did not indicate that there were insufficient funds to pay them. *Id.* at ¶¶38, 56. On at least two occasions, the Bank approved ABG's payments without obtaining approval from the Debtor. *Id*. at ¶58. The Debtor obtained a Certificate of Occupancy and moved into the Center on March 31, 2010. *Id*. at ¶40.

Prior to the Bank's initial loan to the Debtor in October 2008, the Bank had actual knowledge that the Debtor would be undercapitalized and could not fund the construction of the Center. *Id*. at ¶41. In January 2010, before the Bank increased the initial loan by approximately $350,000, the Bank knew the increase would remain insufficient to fund the projected additional cost to construct the Center. *Id*. at ¶¶47, 49, 51-52. The Bank purposefully withheld from ABG the fact that the increased loan would not cover ABG's construction costs and change orders to induce the Debtor to finish construction. *Id*. at ¶¶62-63.

4

The Debtor filed a voluntary chapter 11 petition on June 8, 2012, and scheduled the Bank's total claim as $3,194,640.00 secured by a lien on the Center, which was valued at $3,151,526.00.  *Id*. at ¶¶6, 66-67.

## Legal Standard

The motion is brought under Fed. R. Civ. P. 12(b)(6), which applies in adversary proceedings pursuant to Fed. R. Bankr. P. 7012(b).  "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231-243 (4th Cir. 1999) (internal quotation marks and alternations omitted).  When ruling on a motion to dismiss, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) (internal quotation marks omitted) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.  See also Twombly,* 550 U.S. at 570 (Plaintiffs must nudge their claims "across the line from conceivable to plausible.").  The Supreme Court has noted that the plausibility determination is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  When presented with a complaint, a

5

court may look to "more likely explanations" to find that the allegations do not plausibly establish the claim. *Id*. at 681.

Under Fed. R. Civ. P. 12, the consideration of materials outside the pleadings typically converts a motion to dismiss to a motion for summary judgment. Fed. R. Civ. P. 12(d). However, a court may consider extrinsic documents attached to a motion to dismiss without converting it to a motion for summary judgment "so long as they are integral to the complaint and authentic." *Anand v. Ocwen*, 2014, 754 F.3d 195, 198 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Mem. Hosp*., 572 F.3d 176, 180 (4th Cir. 2009)); *see also Robinson v. Am. Honda Motor Co*., 551 F.3d 218, 222–23 (4th Cir. 2009). "When a document is properly considered in the context of a motion to dismiss and it conflicts with the bare allegations of the complaint, the document prevails." *Tinsley v. OneWest Bank, FSB*, 2014 WL 1017516, *6 (S.D.W.Va. Mar. 14, 2014).

## Discussion

ABG seeks a determination that the Bank's claim and liens should be equitably subordinated pursuant to 11 U.S.C. §510(c). Defendants argue that the Complaint should be dismissed because (1) it fails to state a cause of action for equitable subordination; (2) it fails to plead misrepresentation with particularly as required by Fed. R. Civ. P. 9(b); and (3) under the concurrent remedy doctrine, laches and waiver would apply to bar ABG's claims. The court concludes that the Complaint fails to state a plausible claim for equitable subordination and therefore finds it unnecessary to address the defendants' remaining arguments.

Equitable subordination was judicially created under the Bankruptcy Act of 1898. *Badger Freightways, Inc. v. Continental Illinois Nat'l Bank and Trust Co. of Chicago (Badger Freightways)*, 106 B.R. 971, 975 (Bankr. N.D. Ill. 1989) (citing *Pepper v. Litton*, 308 U.S. 295,

370-08, 60 S.Ct. 238, 245-46 (1939)).  The doctrine was codified in the Bankruptcy Reform Act of 1978.  *Id*.  Section 510(c) of the Bankruptcy Code provides:

> Notwithstanding subsections (a) and (b) . . . , after notice and hearing, the court may –
> 1. under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> 2. order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. §510(c).  Prior to the enactment of §510(c), the Fifth Circuit identified a three factor test to determine whether equitable subordination is proper.  *Benjamin v. Diamond (Mobile Steel)*, 562 F.2d 692 (5th Cir. 1977).  Under the test, the following three factors must be met before equitable subordination is appropriate:

> i. The claimant must have engaged in some type of inequitable conduct;
> ii. The conduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;
> iii. Equitable subordination must not be inconsistent with the provisions of the Bankruptcy Act.

*See Mobile Steel*, 563 F.2d 692 at 699-700; *Badger Freightways*, 106 B.R. at 976; *In re Wilson*, 359 B.R. 123, 138 (Bankr. E.D. Va. 2006).

The parties agreed that the *Mobile Steel* factors apply to this case.

To satisfy the first factor of *Mobile Steel*, the Complaint must allege facts demonstrating that the claimant whose claim is sought to be equitably subordinated engaged in "inequitable conduct."  *Badger Freightways*, 106 B.R. at 976.  In general, the following categories are considered inequitable conduct: "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of debtor as a mere instrumentality or alter ego."  *In re Wilson*, 359 B.R. at 138 (quoting *In re Hedged-Invs. Assocs., Inc.,* 380 F.3d 1292, 1301 (10th

Cir. 2004)); *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1467 (5th Cir. 1991).

The parties agree that to satisfy the undercapitalization category of the first *Mobile Steel* factor ABG must establish that the Debtor was undercapitalized, plus the Bank engaged in conduct which "shocks the conscience" of the court.[2]  *See Stratton v. Equitable Bank, N.A.,* 104 B.R. 713, 730 (D.Md. 1989) (citing to *In re Beverages International, Ltd.,* 50 B.R. 273, 281 (Bankr. D.Mass. 1985)).

The severity of the conduct depends on whether the claimant owed a fiduciary duty to the debtor and the debtor's creditors.  *See Badger Freightways*, 106 B.R. 972.

> The burden and sufficiency of proof required are not uniform in all cases. Where the claimant is an insider or a fiduciary, the [plaintiff] bears the burden of presenting material evidence of unfair conduct. . . .  If the claimant is not an insider or fiduciary, however, the [plaintiff] must prove more egregious conduct . . . .

*In re Daugherty Coal Co., Inc.,* 144 B.R. 320, 324 (N.D. W. Va. 1992) (quoting *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir. 1986)); *See also In re Teltronics Services, Inc.*, 29 B.R. 139, 169 (Bankr. E.D.N.Y. 1983); *In re Osborne*, 42 B.R. 988, 997 (W.D. Wisc. 1984); *In re Pinetree Partners, Ltd.*, 87 B.R. 481, 488-89 (Bankr. N.D. Ohio 1988), *disagreed with, for other reasons, by In re AutoStyle Plastics, Inc.,* 269 F.3d 726 (6th Cir. 2001); *In re Minnesota Kicks, Inc.*, 48 B.R. 93, 106 (Bankr. D. Minn. 1985).

In summary, to survive the Bank's motion to dismiss, ABG must allege sufficient factual matter that (1) the Bank and the Debtor had a fiduciary relationship such that the Bank owed a fiduciary duty to ABG, and the Bank's conduct breached that duty; or (2) the Bank engaged in egregious conduct that shocks the conscience of the court.

---

[2] The Bank argues that ABG has not stated a claim that the Debtor was undercapitalized at the pertinent times.  In light of the holding here, the court need not address that issue.

*Dominion and Control.*

Generally, a lending institution does not owe a fiduciary obligation to its customers. *Badger Freightways,* 106 B.R. at 976.

> An exception to this general rule exists when the lending institution exerts "dominion and control" over its customer. The rationale behind this exception is significant. If the lending institution usurps the power to make business decisions from the customer's board of directors and officers, then it must also undertake the fiduciary obligation that the officers and directors owe the corporation (and its creditors). This reasoning also dictates the scope of the term "control." What is required is operating control of the debtor's business, because only in that situation does a creditor assume the fiduciary duty owed by the officers and directors.

*Id.* at 977. Every lending institution, through its loan agreement, exercises some degree of control over its borrower. *In re Clark Pipe & Supply Co.*, 893 F.2d 693, 701 (5th 1990). In re Clark Pipe & Supply Co., 893 F.2d 693, 701 (5th Cir. 1990). Therefore, operating control of the borrower's business is required for a fiduciary obligation to arise. *Badger Freightways,* 106 B.R. at 977.

Courts have found operating control when a lending institution exercised control to direct activities of the debtor. *In re Clark Pipe & Supply Co.*, 893 F.2d 693, 701 (5th Cir. 1990). *See also In re WCC Holding Corp.*, 171 B.R. 972, 987 (1994) (citing *Murchison v. Continental Bank,* 154 B.R. 909, 913 (Bankr. N.D. Tex. 1993) (stating that the lending institution must have exercised actual managerial control or had some special affinity that extends beyond an arm's-length business relationship)). The case of *In re American Lumber Co.*, 5 B.R. 470, 478 (D. Minn. 1980) demonstrates operating control. There a lending institution held a "legal right to a controlling interest in the company's stock, effectuated termination of all employees other than those necessary to liquidate the business, contracted for a security force to guard the company,

9

determined which of the corporation's creditors would be paid, and told a corporate officer he could quit if he disapproved of the bank's conduct." *Badger Freightways,* 106 B.R. at 977.

In contrast, "[c]ontrol is not indicated by financial leverage or the ability to exercise contractual rights." *WCC Holding Corp.*, 171 B.R. at 987.  Courts have not found operating control when a lending institution enforces "standard loan agreement restrictions, closely monitors the debtor's finances, or makes business recommendations, even in the context of heated bargaining negotiations . . . ." *Badger Freightways* 106 B.R. at 977; *In re Ludwig Honold Mfg. Co., Inc.,* 46 B.R. 125, 129 (1985); *Teltronics Services,* 29 B.R. at 172.  *See also Osborne,* 42 B.R. at 997 (finding no control where lender's status with debtor "approached" a joint venture, lender paid debtor's other creditors directly, and use of loan proceeds was subject to lender's direction).

ABG's allegations in support of its claim that the Bank controlled the Debtor's financial affairs fall far short of these standards, even when viewed in a light most favorable to it.  ABG's primary allegation is that the Bank reviewed and approved payment applications and change orders on the construction of the Center.  Complaint at ¶¶ 22, 25.  This fails to state a plausible claim of control for several reasons.  First, the Complaint recognizes that ABG and the Bank entered into the Contractor Agreement in which ABG agreed that the Bank could review and approve change orders.  *Id*. at ¶¶15, 16, 17.  ABG expressly agreed to give the approval right to the Bank presumably for whatever benefit ABG perceived it would receive under the Contractor Agreement.  Thus, in reviewing and approving change orders, the Bank was acting in accordance with the contractual rights it obtained from ABG.  Having contractually agreed that the Bank could have an approval right, ABG does not state a plausible claim by now pointing to the same approval right to establish that the Bank unduly controlled the Debtor.

10

Further, ABG's allegation essentially elevates form over substance.  While the Complaint alleges that the Bank had the right to approve applications and change orders, the Complaint states that the Bank approved *every* application and change order that was submitted to it.  Thus, the Complaint does not allege that the Bank vetoed any action the Debtor or ABG sought to take, disallowed any payment the Debtor sought to make, or required either the Debtor or ABG to take any action it would not have taken in the absence of the Bank's approval.  There simply are no allegations that the Bank inserted itself in the construction process other than to review and approve the requests for payment.  Finally, it does not shock the conscience that a construction lender would want to review and approve applications for payment and change orders for the construction work on the project funded by its loan.

ABG's other allegations of control are unavailing.  It asserts that on two occasions, the Bank approved two payments without first obtaining approval from the Debtor or the Debtor's architect.  *Id.* at ¶58.  Here, again, however, in approving the payments, the Bank did what both the Debtor and ABG wanted it to do.  ABG also asserts that the process under which it was paid was that it went to the Bank's branch to pick up checks payable to ABG.  *Id.* at ¶57.  These allegations of control – to the extent they even evidence control – are much less than the severity of control required from prevailing case law.

Accordingly, the court concludes that ABG has not stated a plausible claim that the Bank exerted dominion and control over the Debtor such that a fiduciary relationship was created, or that the Bank engaged in egregious conduct by controlling the Debtor's financial affairs.

### *Inducement and Misrepresentation.*

In contending that the Bank engaged in egregious behavior by inducing ABG to continue to work on the Center, ABG does not allege the Bank made an affirmative representation or

statement that there would be sufficient funds available to fund all change orders. And, because ABG knows what the Bank told it, it is now apparent that ABG cannot make such an allegation. Rather, ABG alleges that the Bank engaged in egregious conduct by approving change orders while failing to inform ABG that there would be insufficient loan proceeds to pay it in full. Complaint at ¶¶61-64. Specifically ABG alleges:

> 61. [A Bank employee] communicated with [an ABG employee] in early January 2010 with respect to the increase in line of credit that the Original Lender extended to the Debtor.
>
> 62. At no time in early January 2010 did [the Bank employee] indicate to [the ABG employee] or any of ABG's principals or employees that the increased credit to be extended to the Debtor would not be sufficient to cover ABG's construction costs and change orders, of which Original Lender had actual knowledge of and had previously approved.
>
> 63. Original Lender purposely withheld from ABG the fact that the Debtor did not have sufficient funds to pay ABG for the total cost of construction of the Center, including all change orders that were submitted to Original Lender for approval and which were approved, in order to induce the Debtor to finish construction of the Center.
>
> 64. Notwithstanding its right, pursuant to the Agreement, to remedy the Debtor's failure to pay ABG pursuant to the approved change orders and thereafter advance funds for ABG's completion of the work to be performed under the SFA Agreement in order for ABG to continue to furnish its services pursuant to the SFA Agreement, the Original Lender instead remained silent regarding the Debtor's inevitable payment default and permitted ABG to fully construct the Center.

Complaint at ¶¶61-64. Thus, ABG's claim rests on the contention that the Bank engaged in egregious conduct by remaining silent on the issue.[3]

---

[3] In ¶65 of the Complaint, ABG states that that it relied on the Bank's communications that "the Debtor's line of credit would be increased to fund all construction costs . . . ." Complaint at ¶65. Nowhere in the Complaint does ABG allege any such communications, and this allegation appears factually inconsistent with the allegations in the preceding paragraphs that the Bank "purposely withheld" this information and "remained silent." *Id*. at ¶¶63, 64. At the hearing on the motion to dismiss, ABG made clear that it could not allege that the Bank made any express representations that the loan would be increased to pay the construction costs. Rather, the communications to which ¶65 refer are the communications in which the Bank was silent on the matter.

ABG does not specifically argue that the Bank had a legal or contractual duty to inform it of the loan position. ABG argues that the Bank's approval of the change orders, coupled with the Bank's failure to inform ABG that there would not be sufficient funds available under the loan to pay the additional costs, led ABG to believe the Bank would fund the costs associated with ongoing change orders. It contends the Bank benefited from its silence because ABG's continued work on the Center enhanced the value of the Bank's collateral. This, ABG contends, is egregious conduct that warrants equitable subordination.

The difficulty with ABG's position is that the parties entered into the Contract in which they expressly agreed on the relative duties and obligations between them. Under the Contractor Agreement, ABG's assumption – that the Bank would pay the change orders because it approved them and did not inform ABG otherwise – was unwarranted, and therefore does not provide a basis for a plausible claim of equitable subordination.

Initially, to state the obvious, the Contractor Agreement imposed no express duty on the Bank to provide ABG with information or updates on the loan relative to the costs being incurred by the Debtor. While this factor is not determinative, the lack of such a duty is noteworthy by its absence.

In addition, the court rejects the notion that the Bank's right to approve change orders created an implied duty to inform ABG of the lack of availability of loan funds to pay the work performed on the orders. In approving change orders, the Bank was doing nothing other than what it had the express right to do under the Contractor Agreement. ABG agreed to give this right to the Bank but, for whatever reason, it did not obligate the Bank to inform it of the loan status in return. Stated otherwise, the Bank's right to approve change orders did not impliedly make it the guarantor of payment on approved orders.

Moreover, imposing an implied duty to inform on the Bank is inconsistent with the terms of the agreement.  Paragraph 7 of the Contractor Agreement expressly provided that ABG "*will give* the Bank written notice of any default by the [Debtor] under the Contract."  Contractor Agreement at ¶7 (emphasis added).  Once ABG gave the Bank notice of the Debtor's default, the Contractor Agreement provided that ABG would not terminate the Contract provided, ultimately, that the Bank advanced funds after the default to pay for the work.  *Id*.  Thus, under the Contractor Agreement, both parties obtained agreed-upon protections.  If the Debtor failed to pay ABG, ABG was obligated to give the Bank notice of the Debtor's default, and then the Bank would either fund the defaulted payments or ABG could terminate the Contract.

In light of these provisions, there is no need for a court-imposed implied duty on the Bank to inform ABG that loan funds were not available to pay for a change order.  The parties agreed to their own procedure for addressing payment shortfalls.  Those procedures control.

The foregoing conclusion is substantiated by the facts alleged in the Complaint.  The Complaint acknowledges that the Debtor was in default due to its failure to make payments and as a result of construction delays in November 2009, well before the January 2010 time frame during which ABG alleges the Bank improperly remained silent:

> 59. [The Bank] was aware as early as November 24, 2009, that ABG would be submitting delay claims to the Debtor in connection with the delays described above.
>
> 60. As early as December 30, 2009, [the Bank] was aware that the Debtor's failure to fund ABG's construction costs was causing ABG to become past due with respect to payments owed to its subcontractors.

Complaint at ¶¶59, 60.  *See also* Complaint at ¶¶27, 29.  The Complaint further acknowledges that ABG did not give notice of default.  *Id.* at ¶65.  A notice of default would have triggered the Bank's obligation to fund the change orders or allow ABG to terminate the Contract.

ABG seeks to impose a duty on the Bank that was not required by the Contractor Agreement, while absolving itself of an obligation with which it did not comply.

> [The party seeking equitable subrogation] submits that conduct may be "unfair" and "inequitable" for this purpose even though the creditor complies with all contractual requirements, but we are not willing to embrace a rule that requires participants in commercial transactions not only to keep their contracts but also do "more" – just how much more resting in the discretion of a bankruptcy judge assessing the situation years later. Contracts specify the duties of the parties to each other, and each may exercise the privileges it obtained.

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1356 (7th Cir. 1990). The Bank's right to review change orders under the Contractor Agreement, coupled with ABG's failure to give the required notice under the Contract, makes its claim that the Bank engaged in egregious conduct by remaining silent implausible.

## Conclusion

For the foregoing reasons, the court concludes that ABG has not stated a plausible claim for equitable subordination. A separate order will issue.

cc:   Plaintiff
      Plaintiff's counsel
      Defendants
      Defendants' counsel
      Trustee
      United States Trustee

**END OF MEMORANDUM OF DECISION**